Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Thank you, Ms. Tisa. Good morning to everyone. I think I speak for both Judge Grant and Judge Brasher when I tell you we wish we could be together with you in person. And we hope that today is not too far away. But we've been doing this for quite some time now, and it seems to work. So we will get underway this morning. I think I have experienced counsel here today. I'm going to try to enforce our traffic light system on timekeeping. And with that, I'll call the first case, the United States of America v. Dr. Mencia. Good morning. May it please the court, on behalf of Andres Mencia. Dr. Mencia was acquitted of 10 of the 11 counts against him. He was only found guilty of conspiracy to distribute controlled substances outside the course of professional practice and not for legitimate medical purpose. The government used facts not in evidence and actually facts contrary to the evidence in order to convict him of this count. So first, let's talk about, I'd like to talk about the government's improper remarks. First, during the cross of Dr. Warfield, who was actually the defense expert but had previously been the government's expert, the government told the jury that Dr. Warfield had previously told the prosecutor in a conversation outside the presence of the jury that under no circumstances is it within the scope of professional practice to give a medical assistant a pre-signed prescription. Defense counsel immediately objected and moved to strike, and the court said no. What lawyers say is not evidence, but this was not sufficient to cure the prejudice, not only from this statement but then from what the prosecutor went on to say in closing where he repeated this over and over again. In closing, the government made this pre-signing of prescriptions the main issue in the case. Not only was the pre-signing prescriptions the main issue, but also Dr. Warfield's opinion that supposedly pre-signing prescriptions was outside the usual course of professional practice. And as this court is well aware, in United States v. Easter, cited too in the initial brief, this court has said that based on the government's unique burden of justice and heightened responsibility, improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight. But before getting to the actual statements in the closing, I want to quickly mention Dr. Silverman, the government's expert. And Dr. Silverman gave an incorrect legal opinion that there are criminal penalties for violating these Florida administrative laws. And there are not. I don't think anybody disputes that. And once this incorrect opinion was given, it was error for the court not to allow the defense to correct the record. Defense tried during Dr. Silverman's testimony and again during direct of Dr. Warfield, its own expert, but was not permitted by the court. And then the government relied on this improper opinion in closing, telling the jury that it was a crime to pre-sign prescriptions, when that is not what the statute says. So the government's question- On the issue of Silverman, it was my understanding that the question that he was responding to was a question asked by defense counsel. So what do we do with that? Yes, your honor. So the question by defense counsel was not asking him for a legal opinion. It was asking basically how these Florida administrative statutes worked. But regardless, once the question was asked, an incorrect legal opinion was given. It was incorrect what Dr. Silverman was saying. So at that point, defense counsel has to be able to correct the record. Defense counsel told the court and the government that it was incorrect, that this went again with what the administrative statute said. So again, at that point, it becomes evidentiary error to not allow defendants to correct the record. And then again, this was relied upon in closing by the government. So the government stated in closing that the main issue in this case is pre-signing of prescriptions. If Dr. Mencia gave the medical assistants a pre-signed prescription, then it is game over. And then the government told the jury that Dr. Silverman said there is no dispute. It is outside the scope and not for a legitimate medical purpose to hand out pre-signed prescriptions. There is no dispute about that. And then in rebuttal closing, that pre-signing prescription is a crime. What are you saying there's no dispute about? You said a couple of things. I want to make sure I understand which thing you're saying there's no dispute about. That that was said at trial or that that is true or untrue? Yes, your honor. So what the government said there's no dispute about is that pre-signing prescriptions is outside the scope of professional practice. The government told the jury that both experts, meaning defense expert Dr. Warfield and its own expert, Dr. Sullivan, agreed that pre-signing of prescriptions was a crime and pre-signing of prescriptions was outside the scope of professional practice. But that's not what Dr. Warfield said. I mean, she testified very stated over and over again in her testimony that she had concerns about pre-signing of prescriptions, but she still believed that Dr. Mencia was practicing within the scope of usual course of medical practice. She said it three times on 962 in her testimony, 990, 1002. The government claims this could be maybe a fair inference from her testimony because she did say that medical assistants should not have been given blank prescriptions. But again, she listened to all the testimony. She made very clear that even though she understood that there were pre-signing prescriptions, which concerned her, she still believed that Dr. Mencia was acting within the usual course of professional practice. I mean, that sounds like the jury argument, basically making a closing argument to a jury about how these experts should be interpreted. I just don't see that that's something that we should be concerned about. I mean, the evidence here, from my perspective, seems to be overwhelming with respect to your sufficiency of evidence argument. I mean, the medical assistants testified against the doctor. There was a sting operation where an individual went in and got a these medicines without examining them. I mean, I get your jury argument, but it just seems like there's sufficient evidence for the jury to come back. What am I not understanding about this? Yeah. Well, Your Honor, two things to respond to that. I mean, first of all, when you said that this is just responding to the evidence, that this is something that's open in closing, this is a little bit different because the prosecutor discussed in cross-examination, a personal conversation that he claimed to have with the expert outside the presence of the jury, where she told him something different. And so then he is alluding to this separate conversation throughout closing, to this conversation outside of the presence of the jury. So I think that that is what changes it from a typical argument in closing, where the jury can decide. The jury is choosing to either believe the prosecutor or not believe the prosecutor, and that complicates the matter. As to the evidence, I mean, there is a sufficiency of the evidence argument that I raised, of course. But here, actually, because it's a prosecutorial misconduct argument, we don't have to look at the evidence in the light most favorable to the government. It's de novo review for this court. And so the question becomes, you can also look at the exculpatory evidence, which the jury wasn't considering at the time because the jury was told by the government that defense expert believed that if Dr. Mencia pre-signed prescriptions, it was game over, that it was outside the course of professional practice. And the defense never contended that Dr. Mencia did not pre-sign these prescriptions. But turning to the evidence to the videos that Your Honor discussed, I don't agree, Your Honor. I don't think the video showed him giving these prescriptions without acting as a doctor. It actually showed the opposite. The undercovers all went in and said that they had problems. The one, excuse me, that spoke with Dr. Mencia went in and said he had a back problem. Dr. Mencia is giving blood tests. He's talking to the undercovers about lowering his cholesterol. He's saying to the undercovers, I'm not going to give you Xanax. I'm not going to give you Adderall. He really is acting as a doctor. Again, and also the medical assistants you can see in the video are doing things behind Dr. Mencia's back. So one of the undercovers says to one of the medical assistants that he wants Adderall. And the medical assistant doesn't say, of course, Dr. Mencia is going to give you whatever he wants. The medical assistant says, here's what you say to Dr. Mencia, lie and tell him this. And then he says, don't tell him we're friends because if you do, he's not going to give it to you. I see that my time is up. Thank you. Ms. Mariani. Good morning, Your Honors. May it please the court, Assistant United States Attorney Nicole Mariani on behalf of the government. Despite the contentions he was just making to the contrary, Mencia is not just a negligent doctor who got entangled with some vague laws. As the evidence clearly demonstrated, he was a drug dealer in a white coat who profited handsomely from his opioid selling scheme and was well aware that he was violating the law. For years, he directed his medical assistants to sell controlled substance prescriptions to patients without regard for their medical need for those prescriptions. When for years, he took home envelopes of cash every night from those drug sales. And when for years he took steps to conceal the conspiracy. The evidence against him, as Judge Brasher pointed out, was certainly overwhelming, particularly the corroborated testimony of his three medical assistants that he was the leader and primary financial beneficiary of the drug conspiracy. And Mr. Mencia has not raised a reversible error with respect to the admission of the expert testimony. If this court does not have a different preference, I'll begin where Ms. Litwin spent the majority of her time, which is discussing both Dr. Silverman and Dr. Warfield's testimony. With respect first to the cross-examination of Dr. Warfield and sort of the exchange between the government and Dr. Warfield, I think it's helpful to really step through the context of that conversation. This was not a case of improper vouching, which occurs when the government implies that there's evidence outside the presence of the jury that supports the witness's credibility. What occurred here was the government was using a prior statement of Dr. Warfield to clarify her testimony in response to a reference that she first made. And both Warfield's and the prosecutor's recollection of that statement was before the jury. Specifically, after testifying on direct that she'd been initially retained as a government witness about her findings, Warfield then on cross-examination first states, and this is at docket entry 275, page 1002, we had discussions about this. And I told you that I thought that his practice was within the usual course of medical practice. And I also told you that I had concerns about the on-site prescriptions. In response, the government then asked the question that Mencia is now challenging, which was, now, in fact, it wasn't just that you had some concern about the medical assistance. I believe what you told me was that under no circumstance would it be within the scope of professional practice to give a medical assistant a pre-signed prescription for them to fill out at their discretion for a controlled substance. Do you agree with that? Warfield then responds, I believe what I said was, I thought those medical assistants were practicing medicine without a license. And they in no way should have been given blank prescriptions to prescribe opiates to those patients. Accordingly, both Warfield's and the government's recollections of their conversations before the jury, no evidence was withheld and the government was not seeking to bolster the credibility or sort of imply anything else. You know, they were merely, Warfield brought up a discussion she had had with the government and the government was trying to clarify exactly what had been said between the two of them. I also think the government's closing argument did not go beyond the scope of Warfield's testimony regarding the medical assistants and the pre-signing of prescriptions. It was a reasonable inference to draw from her testimony that while she remained unwilling to opine that Mencia himself was acting outside the usual course of professional practice, that she believed- Oh, it's the opposite. I mean, it wasn't that she was unwilling to opine that he was practicing outside the course of medical practice. She affirmatively said he was practicing within the course of a legitimate medical practice. That's correct, Your Honor. But at the same time, she was also saying these medical assistants were practicing- Who were not on trial. I mean- Were not on trial, correct, but it could be taken from her testimony that these medical assistants, by using these pre-signed prescriptions and by prescribing medications, they were acting outside the usual course of their professional practice because medical assistants- I would love to- Since you're- I always like to take advantage of having people that know more about this than I do. I've seen these cases over the years. In another life, I used to work with the medical licensing board here in Georgia when I worked at the attorney general's office. It's always seemed out of whack to me to ask a jury to decide what's a proper medical practice. Does the medical board, licensing board in Florida, do anything about these cases? It seems like we would solve this problem by just taking the medical license away from these guys. Do you all have any interaction with the medical board in Florida? I don't specifically work in that area. I don't know for sure. What we're dealing with in both the Supreme Court's law and more, and then in this court's law, as we've developed the section 841A1 law, is this idea that a physician is convicted of unlawfully dispensing a cultural substance. If he acts either, he prescribes that medication either without a legitimate medical- I'm familiar with that. I read Dr. Warfield's testimony. I think her approach is pretty compelling. These pain treatment practices are very difficult. Not a lot of doctors want to do it. A lot of the doctors get into trouble doing it. At the end of the day, the question put to the jury is, was this doctor practicing medicine the way he should have been? I just am not sure if 12 white people are the best way to resolve that question. That's just something I've observed over the years. I think that is certainly an interesting question, but the state of the law in our circuit is that this determination, is a doctor practicing medicine outside the usual course of professional practice, is clearly a question of fact for the jury to resolve. That's something that's been held since 1970s in the Greenfield case. I'll just follow up on that. The DEA and the Florida Department of Health were both investigating this doctor up to the point where he was raided. There was a state investigatory agency who was involved in licensing doctors as well. The DEA was involved in licensing doctors to fill prescriptions that were both involved in shutting this guy down. That's what led to the prosecution. I never shut him down. Right. At that point, that's correct, because at that point after his office was raided, he was arrested and this prosecution began. Again, I'll touch on Dr. Silverman to come back to the point Judge Brasher made. This isn't a case, I think that's sort of at the margins, which maybe Judge Martin is talking about. This is a case with really overwhelming evidence. We have the direct testimony from the three co-conspirators saying, he directed us to do this. He told us to write prescriptions for these CoG patients to take the $300 without Dr. Mencia really examining them, doing thoughtful care, thinking about them. In addition to through medical assistance, you have the testimony of the receptionist and the financial manager saying at the end of every day, the medical assistance would give them really sort of like fistfuls of cash. They would put them in a separate envelope from all the other patient payments. Dr. Mencia took that money home every night, or if he didn't, he directed the financial manager to use that money to pay cash, to pay for construction and labor on a new multimillion dollar home he was building. You have Dr. Marrero, who came in and testified and said, I saw a bunch of his patients. They were drug seeking. They didn't want treatment. They were failing drug tests. I discharged them. Mencia then took those patients back and resumed prescribing them opioids. That is something, of course, that it seems fair for a jury to be able to consider whether that's consistent with their understanding as a factual issue of what medical practice is, right? Absolutely. There's a certain and there is case law in the circuit certainly saying that although expert testimony on what is or is not the usual course of professional practice is certainly can be helpful for the jury. That sort of testimony is not required and jurors can use their common sense and look at all the evidence to decide, is this what a doctor looks like or is this so beyond the bounds that even a lay person could find that? I think in this case, it certainly was so beyond the bounds. I can't recall. What was Dr. Mencia's original specialty? Oh, he's a geriatric specialist. He's not certified in pain management at all. And so that was the facility where he was doing this, running the scheme out of was the, I believe, the Adult and Geriatric Institute, but many of his Code G patients, the patients who he was prescribing multiple controlled substances to were much younger. For example, patient J.H., the one who fatally overdosed using prescriptions from Mencia, he was 27 years old. Yeah. And J.H., was that the one where his parents called the practice and said, please stop giving this person opioids? He will die if you do that. And then the doctor just kept doing it even though his parents had called and asked him to stop doing it? It was his girlfriend and his grandmother, but yes, J.H.'s girlfriend testified that she and his grandmother had called the receptionist at Dr. Mencia's practice and said that J.H. was an addict and that they also contacted Dr. Mencia's practice after J.H. overdosed and had informed them that their son had overdosed. Yeah. And so it seemed to me, and just, I mean, correct me if this is wrong about kind of your theory of what happened here, but it seemed like this was just a straight up credibility determination that the jury had to make. You had the medical assistant saying the doctor was the one who was responsible for all this. You had the doctor saying the medical assistants were the ones who were responsible for all this. With respect to J.H., he said, I just didn't know, my receptionist didn't tell me about that. And so the jury just had to decide whose testimony to believe. Someone was doing something wrong and it was just who was doing it wrong, right? Absolutely, Your Honor, that's correct. And speaking about all of this, the really overwhelming evidence in this case that helps goes to the fact that although I disagree with Ms. Flitwin that there was any prosecutorial misconduct in this case, that it certainly did not create substantial prejudice and any sort of issues with the admission of the expert testimony was certainly harmless. I'm glad you brought that up. Speaking only for myself, I'm pretty comfortable with the sufficiency of the evidence, but I was a little bit concerned by the late breaking expert disclosures. Can you explain why it took so long after the request from the defendant for the government to make those expert disclosures and whether that was prejudicial to receive so many disclosures so close to trial? They're only challenging one here, but it seems very tight to take depositions and deal with all those experts in such a short time, even if you can fairly argue that they could deal with one in that amount of time. Yes, correct, Your Honor. Our Rule 16 expert note disclosures were made 13 days before trial and ultimately the two that Dr. Mencia has challenged, it came in 16 days before Dr. Silverman testified and I believe 20 days before Dr. Sullivan testified. But a month after the request for the defense made the request in, I believe, an early map. Do you know why it took so long? Were those experts not developed yet or was there another reason? I believe that it's the experts were still being developed. We had initially retained Dr. Warfield. We had retained Dr. Silverman sort of at the same time. I think that the trial attorneys were still putting the case together. I believe it's something that is discussed in sort of some of the pretrial that wasn't raised as much in the brief. There were some computer issues dealing with Dr. Mencia's patient files that it took a while to get those sorted out. They were sort of given in a very convoluted form that no one figured out for a little while. But I think sort of even though they did come two weeks before the trial, the case law in Rule 16 is very clear that that is more than enough time, sufficient time for a disclosure, that the disclosures were certainly significant enough. I mean, the discussion of Dr. Silverman was over a page long and really set out here are the patient files he reviewed. He looked at those unrecovered videos. He's relying on the relevant Florida statutes. And that's sort of all the same information that Dr. Warfield had looked at, her expert report, and that the defense was working with her. In addition to that, so the law of this case is under Rule 16, it's only a reversible error if there's actual prejudice to the defendant's substantial rights that adversely affected his ability to present a defense. That certainly didn't happen here. Mencia hired his own expert, as we've been discussing. So they had Dr. Warfield and Dr. Silverman sort of giving this contrary testimony that the jury could then evaluate and decide who they found more credible and reliable. Mencia extensively cross-examined Dr. Silverman about a large number of Florida regulations and statutes, really went sort of through the whole rulebook, as well as prior disciplinary infractions. How is Dr. Warfield unreliable? You said they found a more reliable expert. How is she unreliable? I apologize, Your Honor, that was a misstatement. The jury found Dr. Silverman to be more credible than she was, or better believe what Dr. Silverman was saying, as evidenced by their work. I did not mean to call Dr. Warfield's reliability into question. She used the same methodology that Dr. Silverman used, which was reliable. So look at these patient files and these videos and to all the statutes. And in addition, one thing I wanted to point out about this Rule 16 disclosure is that the government offered Mencia a continuance in writing, in one of the pleadings, and he declined. So at this point, I'm not really sure what more he would have done with more time, how he's going to show, how he would show substantial prejudice, had he had more than those two to three weeks to prepare for these experts. And then one thing, and it is sort of laid out in the brief that I wanted to talk about, is to the extent of Dr. speaking about Dr. Silverman, if you actually go through and I see I'm running out of time, the extent and the entirety of his testimony, you can see that one, as Dr. Brasher pointed out, the defense raised these questions and the defense raised three questions, which the district court has held were irrelevant and continue to proceed in the same way. Even though it was very clear that he did not know whether or not the statute had criminal penalties, he was not sure. I see my time has run out. If the court has no further questions, the government will rest on its brief and ask that Dr. Mencia's convictions be affirmed. Thank you. Thank you. Hi, I'd like to sort of begin quickly discussing the late disclosures. In response to Judge Grant's question, in the cross-examination of Dr. Warfield, the government explained that they hired Dr. Silverman the day after they signed a contract with Dr. Warfield, which would mean that they had Dr. Silverman on May 2nd, 2018, but he was not disclosed to defense counsel until June 5th, 2018. Obviously, there's a huge difference between a disclosure two weeks before trial and six weeks before trial. And as Ms. Mariani pointed out, we do have to show prejudice, but I think in this case, it's a little bit different than the typical case because we do have prejudice. This expert, Dr. Silverman, not only did the defense counsel find out that he submitted false bills to Medicare, which, I mean, this is a Medicare fraud case, so obviously that is important, but defense counsel was not able to obtain those bills in the short time. So they were left in cross-examination with Dr. Silverman's explanation, which just was, well, a different clinic did it, I didn't know about it. But they weren't able to evaluate that statement. They weren't able to bring that up in a Daubert hearing or in cross. And similarly, while the government had told them to disclose that there was a wrong site injection that Dr. Silverman did, they weren't able to get the file from the Board of Medicine until mid-cross examination during trial. And in that document, they learned that it wasn't just a wrong site injection, that Dr. Silverman had also modified his files, which again, changing files and lying in files is very important in a Medicare prosecution. But they weren't able to see the files to see if there were any other ones. They were only able to briefly bring it out in cross, but this would also have been highly, highly relevant to a Daubert hearing to exclude him, but also in cross-examination. And as Judge Brasher said, I mean, if this was a credibility determination between these two experts, then anything that would go to the credibility of Dr. Silverman was highly relevant. I will say, however, when we talk about this, I want to turn to the prejudice argument a little bit, because it wasn't necessarily a credibility determination based upon only Judge, I'm sorry, only on Dr. Silverman and Dr. Warfield, because the closing that the government gave said that Dr. Warfield believed the same thing as Dr. Silverman, that it was outside the scope of professional practice to pre-sign these prescriptions. And so therefore, the jury could have believed Dr. Warfield and believed Dr. Silverman and still found Dr. Mencia guilty, because the jury could have believed that Dr. Warfield's testimony was, or Dr. Warfield had previously told the prosecutor outside the presence of the jury, that she believed that pre-signing prescriptions, which again, there was no dispute that it happened in this case, that the act of simply pre-signing prescription pads means that it was outside the scope of professional practice. And it was not. But didn't the jury have, as Judge Brasher said, didn't the jury have the opportunity to hear all of that testimony for itself and make its own judgment? I mean, counsel will certainly try to encourage a particular interpretation of the testimony, but why would we invade the jury's ability to make its own mind up? Well, again, I don't think the jury was given the chance to make their mind up here, because for the way that the prosecutor asked the question to Dr. Warfield said, but didn't you tell me, right, which is a conversation that he's claiming to have had with her outside the presence of the jury, that you believe under no circumstance is pre-signing prescriptions within the ordinary course. So he's referencing a conversation that a prosecutor who, you know, has more esteem with the jury, all the cases have shown, I mean, he's referencing a personal conversation outside of the presence of the jury, and saying that she said something else. And then he's telling the jury over and over again in closing that she did say this thing. So I don't think that we can just leave it up to say that the jury can decide there, because the jury's not deciding at that point a battle between Dr. Silverman and Dr. Warfield. The jury's deciding between Dr. Silverman, Dr. Warfield, and the prosecutor. He's inputting himself into that, and it changes the equation. And quickly, I would like to sort of address the way that we discuss the evidence in this case. The government was discussing, you know, that Dr. Mencia didn't give thoughtful care, but that's not the standard. The standard is whether or not the doctor actually acted, not as a bad doctor, not as a negligent doctor, but as a drug pusher. And if you look at these UC videos and all of the testimony, it's pretty clear that he was still acting as a doctor. I mean, this idea of these fistfuls of cash, that being a cash-paying patient is wrong, two-thirds of Dr. Mencia's patients had insurance. It was only a small part of his practice that were cash-paying patients. And Dr. Marrero, who the government just addressed, was discussing as one of these experts, he took cash-paying patients. Ron Erickson, one of his patients, who had been a Dr. Mencia patient, became a Dr. Marrero patient, and he paid him cash. And Dr. Marrero testified that only one, he only testified about one patient that he saw that he got rid of because he failed his urine test and that Dr. Mencia picked back, and that was Ron Erickson, who also testified. And Ron Erickson testified, first of all, that he had just told Dr. Mencia that he had a dirty urine, that Dr. Mencia said heroin or cocaine, and that when Mr. Erickson said marijuana, Dr. Mencia said, okay, and then he decided to take, he said, I'll take you back. So it wasn't that he was taking all these patients back. It was just, he believed that if you use marijuana, it's still fine. And the last thing I will say is that Ron Erickson also testified that he hid, he had some track marks from being an addict and he hid them from Dr. Mencia because he believed if Dr. Mencia knew that he was using drugs, he would not give him the prescriptions, which all go to the fact, especially when we look at it for the we don't have to look at the evidence of the light, most favorable to the government that Dr. Mencia was acting as a doctor and not a drug pusher. Thank you. And I know you're of your time, but I've got one factual question that I can't recall. Were these prescriptions filled at Dr. Mencia's office or at other pharmacies? At other pharmacies, your honor. Thank you. Thank you. Thank you. We have your case and I appreciate the argument.